**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOE FLORES AND CONNIE FLORES,** ) | **1: 99 CV 5878 AWI DLB** |
| ) | |
| **Plaintiffs,** ) | **MEMORANDUM OPINION AND** |
| ) | **ORDER DENYING MOTION TO** |
| **v.** ) | **AMEND JUDGMENT TO ADD** |
| ) | **INDIVIDUALS AS ALTER EGOS OF** |
| **DDJ, INC., et al.,** ) | **DDJ, INC. AND DDJ LLC** |
| ) | |
| **Defendants.** ) | (Documents #345, #346 #388 #390, |
| _____ ) | #453, & #464) |

## BACKGROUND

In this action, Plaintiffs Joe and Connie Flores sued for damages against a packing merchant dealer and another entity for violations of PACA and state law.   The court had jurisdiction over the PACA claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.   The jury returned a verdict for Plaintiffs, and the court entered judgment on March 11, 2004.   The court then addressed numerous post judgment motions.

On September 13, 2004, Plaintiff Joe Flores filed a motion to add judgment debtors,[1] which Plaintiff Connie Flores joined.   Plaintiffs contend that DDJ, Inc. and DDJ LLC were created by their individual owners as sham corporations to perpetrate fraud, breach contracts, and

---

[1]  Defendants originally opposed this motion.   However, the Trustee for Defendants' bankruptcy estates as now joined in the motion.

1  convert property.  Plaintiffs contend that DDJ, Inc. and DDJ LLC are the alter egos of Dennis

2  Hagobian, Dennis Vartan, Victoria Hagobian, Judith Yeramian, W.D. Farming, LLC, the

3  Yeramian Trust and the Vartan Trust.   To support a finding that the Individuals are the alter

4  egos of the Defendants, Plaintiffs cite to the fact that Defendants no longer have any tangible

5  assets due to the sale of Defendants, from which the Individuals profited, Defendants did not

6  issue stock, Defendants failed to maintain minutes or adequate corporate records, the Individuals

7  diverted corporate funds for their own use, and Defendants were not adequately capitalized.

8       On November 1, 2004, Dennis Hagobian, Victoria Hagobian, Dennis Vartan, Judith

9  Yeramian, and the Yeramian Trust ("the Individuals") filed an opposition.   They contend that

10  there is no unity of interest between Defendants and the Individuals because Defendants had

11  regular board meetings, issued stock, and were adequately capitalized.   The Individuals contend

12  that the checks challenged by Plaintiffs were for payroll, corporate credit cards, and utilities.  In

13  addition, the Individuals contend that they did not siphon off funds during the sale of the packing

14  business and, but for another lawsuit,  Defendants were adequately capitalized.    Finally, the

15  Individuals contend that they did not control the underlying litigation, and the litigation was

16  controlled by Defendants' insurance company.

17       On November 15, 2004, Plaintiff Connie Flores filed a reply to the opposition and request

18  for a continuance to conduct additional discovery.

19       On November 17, 2004, Plaintiff Joe Flores filed a late response to the opposition.

20       On December 6, 2004, the court held a hearing at which the court addressed Plaintiffs'

21  request for a continuance to conduct additional discovery.   At this hearing, the parties agreed

22  that documents submitted by Plaintiffs would not be objected to on authentication grounds.

23  Other than the need to authenticate documents, Plaintiffs stated that there was no other discovery

24  they wished to conduct concerning their motion to add judgment debtors.    At the hearing, the

25  court informed the parties that while the court would take judicial notice of the content of court

26  documents, these documents would not be accepted for the truth of the matters asserted.   In

27

28                                                    2

light of these findings, the court continued the motion.  No additional evidence or briefs were timely submitted.

Prior to the court ruling on the motion to add judgement debtors, Defendants filed for bankruptcy.  On January 10, 2005, the court recognized the bankruptcy filing had stayed this action.  After the bankruptcy stay had been resolved, on October 9, 2007, the court re-set Plaintiffs' motion to add judgment debtors.

On October 17, 2007, Plaintiffs filed a supplemental memorandum of points and authorities.   Plaintiffs cite to actions taken in a Fresno County Superior Court case and arbitration in which DDJ, Inc. and DDJ LLC sued Norman S. Traner and Steven K, Taft ("T&T") based on T&T's failure to pay on a note owed to the DDJ Entities, ("DDJ v. T& T").   Plaintiffs also cite to a related action in which T&T sued the Individuals for fraud, ("T&T v. Individuals").  On October 2, 2003, DDJ v. T&T was dismissed and on October 15, 2003, T&T v. Individuals was dismissed.   Plaintiffs contend that by these actions the Individuals converted some $1,741,148.45 away from funds belonging to DDJ, Inc. and DDJ LLC to resolve their own liability to T&T.

On October 25, 2007, the Bankruptcy Trustee, on behalf of DDJ, Inc. and DDJ LLC, ("Trustee") filed a declaration in support of Plaintiffs' motion.   The Trustee offers his opinion that the Individuals depleted the assets of the corporation for their own benefit without adequate consideration to DDJ, Inc. and DDJ LLC.   The Trustee provides evidence of distributions made to the Individuals.   The Trustee provides evidence that the distributions to the Individuals were not supported by adequate consideration.   Specifically, the Trustee contends that other than a contribution of $30,000 for shares of DDJ, Inc., no additional capital was provided by the Individuals.   The Trustee also contends that the Individuals used DDJ, Inc.'s and DDJ LLC's case against T&T for their own purposes.  The Trustee alleges that to settle claims against them in T&T v. Individuals, the Individuals agreed to release the DDJ Entities' claims against T&T in DDJ v. T&T.

3

On November 1, 2007, Dennis Hagobian and Victoria Hagobian ("the "Hagobians") filed an opposition to Plaintiffs' supplemental pleading.   The Hagobians point out that the briefing on the motion to add judgment debtors was complete prior to the stay in this action.   The Hagobians contend that Plaintiffs never had the court's permission to provide supplemental pleadings.   To the extent the court considers the supplemental pleadings, the Hagobians contend that the relevant events occurred after the events at issue in this action.   As such, the Hagobians argue these events cannot provide a basis for a finding of alter ego.     In addition, the Hagobians ask the court to take judicial notice of the filings in DDJ v. T&T and T&T v. Individuals.   The Hagobians state that a mandatory arbitrator's award made during a mandatory arbitration caused the actions taken by the DDJ Entities and the Individuals in the state cases.   The Hagobians argue that the settlement actions taken in the state cases ultimately resulted in the DDJ Entities owing less money than they would have if the mandatory arbitrator's award had been reduced to a judgment.

On November 7, 2007, Plaintiffs filed a reply.   Plaintiffs contend that at the time Plaintiffs first briefed the alter ego motion, the settlement agreement in the state cases had not yet been filed.   As did the Trustee, Plaintiffs maintain that the Individuals received a benefit in the amount of $1,741,158.45 when they agreed to dismiss the DDJ Entities' claims against T&T in exchange for T&T dismissing its claims against the Individuals.   Plaintiffs also contend that when interest up until November 1, 2007 is considered, T&T would owe the DDJ Entities more money than the DDJ Entities owed T&T.   Finally, Plaintiffs cite the factors to be considered in an alter ego analysts and argue that because the DDJ Entities lack assets, an inequitable result will occur in this case if the Individuals are not found liable.

On November 8, 2007, Judith Yeramian, individually and as trustee ("Yeramian"), filed objections to the Trustee's declaration, to which the Hagobians joined.   Yeramian contends that the Trustee's declaration contains the Trustee's opinions, for which there is no foundational showing as required by Rule 702 of the Federal Rules of Evidence.

**LEGAL STANDARD**

Rule 69(a) of the Federal Rules of Civil Procedure governs the execution of judgments awarded by federal courts.   In the absence of controlling federal authority, Rule 69(a) requires the district court to follow "practices and procedures of the state in which the district court is held." Fed.R.Civ.P. 69(a).   The court looks to California law to determine whether  amendment of the judgment is appropriate in this case.   Section 187 of the California Code of Civil Procedure states "[a] trial court has the authority to amend a judgment in order to add additional judgment debtors." Dow Jones Co. v. Avenel, 151 Cal.App.3d 144, 148 (1984).   Under California law, a judgment may be amended to impose liability upon a person who was not a party to the underlying litigation pursuant to the alter ego doctrine. Farenbaugh & Son v. Belmont Construction, Inc., 194 Cal.App.3d 1023, 1029 (1987); Dow Jones Co. v. Avenel, 151 Cal.App.3d at 148; Alexander v. Abbey of the Chimes, 104 Cal.App.3d 39, 44 (1980); Mirabito v. San Francisco Dairy Co., 8 Cal.App.2d 54, 60 (1935).   This is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. Mirabito, 8 Cal.App.2d at 57.   Here, Plaintiffs have filed a motion in which they request the court amend the judgment to add Dennis Vartan, Dennis Hagobian, Victoria Hagobian, Judith Yeramian, W.D. Farming, LLC, the Yeramian Trust, and the Vartan Trust as judgment debtors on the ground that these individuals and entities are the alter egos of Defendants.


**EVIDENTIARY ISSUES**

**A.  Judicial Notice**

The parties ask the court to take judicial notice of documents filed in this action, in other cases, and the arbitration.   The court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993).   Judicial

notice may be taken of court records.  See Mullis v. United States Bank. Ct., 828 F.2d 1385,

1388 n.9 (9th Cir. 1987); Egan v. Teets, 251 F.2d 571, 578 (9th Cir. 1957); Valerio v. Boise

Cascade Corp., 80 F.R.D. 626, 635 n. 1 (N.D. Cal.1978).   However, as a general rule "a court

may not take judicial notice of proceedings or records in another cause so as to supply, without

formal introduction of evidence, facts essential to support a contention in a cause then before it."

M/V Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir.1983).

       In resolving this motion, the court will consider the court records to show that court

documents have been filed containing certain allegations.   The court will also consider the

arbitration documents provided.   The court will not consider these documents for the truth of the

facts contained in them.    Rather, the court will consider them for the fact certain assertions were

made and certain findings reached.


**B.  The Individual's Objections to Declarations**

       The Individuals have objected to portions of Nunez's,[2] Joe Flores's, and the Trustee's

declarations filed in support of the motion to add judgment debtors.

       The Individuals object to evidence based on authentication grounds.   To the extent the

Individuals originally objected to documents supporting Plaintiffs' motion, at the December 6,

2004 hearing, the Individuals agreed they would not object to documents on authentication

grounds.   Thus, the documents will be considered.

       Flores', Nunez's, and the Trustee's declarations will not be considered to the extent they

include legal arguments.  Legal conclusions are not properly alleged in a declaration.  The proper

place for such statements is in the relevant briefs, where the parties can freely argue what they

believe the evidence shows regarding alter ego, fraud, and the Individuals' motives.

---

       [2]  The court notes that originally Henry D. Nunez represented Plaintiff Connie Flores in this action.   After the bankruptcy stay ended, Nunez began to represent the Trustee.   When Nunez is being referenced in his capacity as Connie Flores' attorney, he will be referred to as "Nunez".   When he is referenced in his capacity as the Trustee's attorney, he will be referred to as "Trustee".

Declarations are also not the place to summerize deposition testimony, documentary evidence, and/or court records, nor are they the proper place to make arguments on what Plaintiffs and the Trustee believe evidence shows.   Again, such arguments belong in the parties' briefs.

Finally, the Individuals have objected to some paragraphs in the declarations that reference a fact over which neither Flores nor Nunez would have personal knowledge because they were not a director, officer, shareholder, investor, or employee of Defendants.   At this time, it is unclear if there is evidence to support some of these assertions in the record.   However, the declarations contain insufficient information on how Flores, Nunez, or the Trustee would have personal knowledge or expert knowledge of these subjects.   Thus, the Individuals' objections are sustained.   However, the underlying evidence referenced in the declarations, such as deposition testimony and documents, will be considered.


**DISCUSSION**

Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. Wenban Estate, Inc. v. Hewlett, 193 Cal. 675, 696 (1924); Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 538 (2000).   "A corporate identity may be disregarded--the 'corporate veil' pierced--where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation.   Sonora Diamond Corp., 83 Cal.App.4th at 538; Roman Catholic Archbishop v. Superior Court, 15 Cal.App.3d 405, 411 (1971).   "The purpose behind the alter ego doctrine is to declare the individual and the corporation are the same entity." Brinell Aimed, SPA v. Bakery Furniture, Inc., 29 Cal. App. 4th 1828, 1841 (1994).

Under California law, there "'is no litmus test to determine when the corporate veil will be pierced,'" and the result will depend on the circumstances of each particular case. Nelson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1543 (9th

7

Cir.1988) (quoting <u>Mesler v. Bragg Management Co.</u>, 39 Cal.3d 290, 300 (1985)).  The

California Supreme Court has explained that before alter ego liability may be imposed, two

conditions must be present:

> [T]he conditions under which a corporate entity may be disregarded vary
> according to the circumstances in each case.  It has been stated that the two
> requirements for application of this doctrine are (1) that there be such unity of
> interest and ownership that the separate personalities of the corporation and the
> individual no longer exist and (2) that, if the acts are treated as those of the
> corporation alone, an inequitable result will follow.

<u>Automotriz Del Golfo De California S. A. De C. V. v. Resnick</u>, 47 Cal. 2d 792, 796 (Cal. 1957)

(citations omitted).  Additionally, the person or entity alleged to be an "alter ego" must be in a

position of control and influence over the affairs of the corporation.  <u>Minifie v. Rowley</u>, 187 Cal.

481, 487 (1921).

The first condition requires that there must be a unity of interest and ownership between

the corporation and the individual.  <u>Automotriz</u>, 47 Cal.2d at 796.

> Among the factors to be considered in applying the doctrine are commingling of
> funds and other assets of the two entities, the holding out by one entity that it is
> liable for the debts of the other, identical equitable ownership in the two entities,
> use of the same offices and employees, and use of one as a mere shell or conduit
> for the affairs of the other. Other factors which have been described in the case
> law include inadequate capitalization, disregard of corporate formalities, lack of
> segregation of corporate records, and identical directors and officers. No one
> characteristic governs, but the courts must look at all the circumstances to
> determine whether the doctrine should be applied. Alter ego is an extreme
> remedy, sparingly used.

<u>Sonora</u>, 83 Cal.App.4th at 538-39 (internal cites and quote omitted); <u>United Community Church</u>

<u>v. Garcin</u>, 231 Cal.App.3d 327, 343 (1991).  Application of the alter ego doctrine does not

depend on prior decisions that appear to be based on similar facts.  <u>Las Palmas Associates v. Las</u>

<u>Palmas Center Associates</u>, 235 Cal. App.3d 1220 (1991).

The second condition requires the court to find that if the acts are treated as those of the

corporation alone, an inequitable result will follow.  <u>Automotriz</u>, 47 Cal.2d at 796.   The lack of

corporate funds to pay the judgment is not enough to impose alter ego liability.  <u>Sonora Diamond</u>

Corp., 83 Cal.App.4th at 539.

> In almost every instance where a plaintiff has attempted to invoke the [alter ego] doctrine, he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather, to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil.

Arnold v. Browne, 27 Cal.App.3d 386, 397 (1972).

Finally, to prevail on a motion to add a judgment debtor, the plaintiff must show not only that the party to be added was the alter ego of the original judgment debtor, but  that the party had control of the litigation and an opportunity to conduct it with diligence corresponding to the risk of personal liability involved--i.e., that the party was "virtually represented" in the action. Triplett v. Farmers Ins. Exchange, 24 Cal.App.4th 1415, 1421 (1994);  NEC Electronics Inc. v. Hurt, 208 Cal.App.3d 772, 778 (1989).

It is the burden of the party asserting alter ego to overcome the presumption of the separate existence of the corporate entity.  Matter of Christian & Porter Aluminum Co., 584 F.2d 326, 338 (9th Cir. 1978);  Mid-Century Ins. Co. v. Gardner, 9 Cal.App.4th 1205, 1212 (1992). The trial court's decision must be based upon a preponderance of the evidence and an appellate court will not disturb the trial court's decision on the issue if there is substantial evidence to support it.  Wollersheim v. Church of Scientology, 69 Cal. App. 4th 1012 (1999); Dow Jones Co. v. Avenel, 151 Cal. App.3d 144 (1984).

**A. Unity of Interest and Ownership**

As discussed above, some of the factors to be considered in determining whether there is unity of interest and ownership include the commingling of funds and other assets, the individual holding himself out as liable for the debts of the corporation, ownership and control of the corporation by the individual, inadequate capitalization, disregarding corporate formalities, and failure to segregate corporate records.  See, e.g.,  Firstmark Capital Corp. v. Hempel Financial

9

1    Corp., 859 F.2d 92, 94 (9th Cir. 1988); Sonora Diamond Corp. v. Superior Court of Tuolumne

2    County, 83 Cal.App.4th 523, 538-539 (2000); Mid-Century Insurance Co. v. Gardner, 9

3    Cal.App.4th 1205, 1213 n. 3 (1992).

4           In this case, many of the factors often discussed in alter ego cases are not raised by

5    Plaintiffs.  For example, it appears that the Individuals never held themselves out as being liable

6    for the corporations' debts, the Individuals did not fail to segregate their own records from that of

7    the corporations, the Individuals did not obtain required licenses or certifications in their own

8    name rather than the corporate name, the Individuals segregated their funds from those of the

9    corporation, the Individuals did not treat the corporations' physical assets as their own, and the

10   Individuals and corporations did not use the same address.   There is no evidence that anyone

11   dealing with Defendant Corporations believed or would have reasonably believed that they were

12   dealing with the Individuals in their personal capacity rather than Defendants.

13          In support of their motion, Plaintiffs contend that the Individuals' status as the

14   Defendants' alter egos can been seen from the fact the Individuals disregarded the corporate

15   form, Defendants failed to obtain permission to issue stock from the Secretary of State, the

16   Individuals used corporate money for personal use, Defendants were not adequately capitalized,

17   the Individuals siphoned off all funds collected in the sale of Defendants' assets, leaving

18   Defendants insolvent, Dennis Hagobian paid funds to revive Defendants' corporate status during

19   trial, and the Individuals actions in DDJ v. T&T and T&T v. Individuals.

20

21   ***1.  Disregarding Corporate Form***

22          In this case, there is evidence that the Individuals did disregard some corporate

23   formalities.   The Individuals provide evidence that they held meetings, memorialized meetings

24   in minutes,[3] filed tax returns, and generated financial statements.   However, Plaintiffs provide

25

26   _____

27          [3]  Plaintiff objects to the minutes supplied by the individuals because he claims they were
     not provided during discovery.

28                                                        10

evidence that the Individuals did not always conduct themselves in a manner expected for

officers or shareholders.

### a. DDJ, Inc.

Judith Yeramian appears to have been given roles "on paper" with DDJ, Inc. that she did

not actually perform.  Judith Yeramian was a shareholder and member of the board of DDJ, Inc.

Ms. Yeramian testified at her deposition that she never attended a board meeting, shareholder

meeting, or any other meeting involving DDJ, Inc.  Ms. Yeramian stated she was not involved in

any business activity of DDJ, Inc.  Ms. Yeramian stated she did not know who the officers or

members of DDJ, Inc. were.   Ms. Yeramian's failure to participate in the running of DDJ, Inc.,

despite her role on paper, provides some evidence that the corporate form was not being strictly

followed as to DDJ, Inc.[4]

In addition, the role of Dennis Hagobian with DDJ, Inc. remains unclear.  Mr. Hagobian's

declaration clearly shows that he was closely involved in running DDJ, Inc, particularly

overseeing its finances.   After 1997, there is evidence that Mr. Hagobian was no longer DDJ,

Inc. 's chief financial officer on paper.   But, it remains unclear who, other than Mr. Hagobian,

took over these functions.  Plaintiff provides evidence Mr. Hagobian continued to take actions

expected of a chief financial officer, such as issuing checks and signing for lines of credit.   Mr.

---

[4] In a declaration submitted in opposition to the motion to add judgment debtors, Ms. Yeramian states that while she did not attend meetings of the board, she would have been available by phone for any important or significant business decision.   This statement conflicts to some extent with Ms. Yeramian's statement during her deposition.   As a general rule "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991); see also Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 807 (1999).   Testimony is not a sham if it merely elaborates upon, explains, or clarifies prior testimony.  Messick v. Horizon Indust., Inc., 62 F.3d 1227, 1231 (9th Cir.1995). Contradictory testimony from a witness is not a sham where the witness was confused at the time of the earlier testimony and provides an explanation for the confusion.  Kennedy, 952 F.2d at 266;  Miller v. A.H. Robins Co., 766 F.2d 1102, 1104 (7th Cir.1985).  Ms. Yeramian offers no explanation for why she did not inform Plaintiffs during her deposition that she was available by phone for any important or significant business decisions. Thus, the court is not inclined to consider Ms. Yeramian's evidence of her involvement. Regardless, even if the court were to consider the fact that Ms. Yeramian was available by phone, there is still no evidence she participated in any respect in the business of DDJ, Inc. despite her role as shareholder and board member.

Hagobian attended meetings and had significant authority concerning DDJ, Inc. yet, on paper Mr. Hagobian was not an officer or agent of DDJ, Inc, implying that the corporate form may not have been strictly followed.

Plaintiffs also contend that the corporate form was not followed because DDJ, Inc. did not keep minutes of its meetings.   The Individuals provide evidence that DDJ, Inc. held board meetings at least once a year.   Attached to Dennis Vartan's declaration are copies of minutes from a July14, 1999 meeting and a January 28, 1999 meeting.   Plaintiffs object to these minutes because they were not produced during discovery and the court has ordered evidence that was not produced cannot be admitted.   While the court declines to consider the minutes themselves because they were never produced during discovery, Dennis Vartan has still signed a declaration stating that the meeting occurred.   Nothing regarding Mr. Vartan's testimony at trial or deposition renders him so incredible that the court finds he is lying about having had some meetings.   However, the failure of Defendants to be able to obtain the minutes during discovery and the fact Mr. Vartan could only find two copies to attach to his deposition, implies that the meetings may have been informal and minutes not always kept.   This, taken with the fact that only Mr. Vartan and Dennis Hagobian appear to ever have attended these meetings, implies that the Individuals were not completely following corporate formalities when having meetings and keeping minutes from those meetings.

Thus, it appears Plaintiffs have evidence showing that, at times, the Individuals disregarded the corporate form of DDJ, Inc..   The evidence indicates that on paper some Individuals had roles with DDJ, Inc. that differ than their real roles.   In addition, board meetings were not always conducted with the formality expected from a corporation.   Thus, DDJ, Inc.'s disregarding of the corporate form in some areas is a factor tilting toward a finding of alter ego liability.

### b.   DDJ LLC

The evidence before the court indicates that Victoria Hagobian and Judith Yeramian

appear to have been given roles "on paper" for DDJ LLC that they did not actually perform. Victoria Hagobian was a member of DDJ LLC.   At her deposition, Ms. Hagobian stated that she did not know she was a member of DDJ LLC, did not know how she became a member, knew nothing about the business transactions of DDJ LLC, and never attended any meetings involving DDJ LLC.   Judith Yeramian was also a member of DDJ LLC.   Ms. Yeramian testified at her deposition that she never attended meetings involving DDJ LLC and was not been involved in any business activity of DDJ LLC.   Thus, as with DDJ, Inc., DDJ LLC was not completely following corporate formalities in the roles it assigned.

In addition, the Individuals have not provided evidence of member meetings.   The failure to DDJ LLC to follow formalities does not assist Plaintiffs in their quest to hold the Individuals liable as alter egos of DDJ LLC.  A member of a limited liability company maybe subjected to alter ego liability under the same circumstances and to the same extent as corporate shareholders. Cal. Corp. Code § 17101(b); People v. Pacific Landmark, 129 Cal.App.4th 1203, 1212 (2005). However, the failure to hold meetings of members or managers or the failure to observe formalities pertaining to the calling or conduct meetings is not a factor to be considered to establish that a member is the alter ego of a limited liability company unless the articles of organization or operating agreement expressly require the holding of meetings of members or managers.  Cal. Corp. Code § 17101(b).   Here, the operating agreement for DDJ LLC specifically states that no annual or regular meetings of the members are required.     The operating agreement also states that members shall devote whatever time or effort he deems appropriate for the furtherance of DDJ LLC's business.   Based on California Corporation Code § 17101(b) and the operating agreement of DDJ LLC, the evidence that DDJ LLC did not follow corporate formalities concerning meetings is irrelevant to the alter ego analysis.

## 2.  Diversion of Corporate Funds

Plaintiffs next contend that the Individuals' status as alter egos can be shown because

1   there were unauthorized diversions of corporate funds.   Plaintiffs provide copies of checks that

2   they claim paid for Dennis Hagobian's and Dennis Vartan's credit cards and other personal

3   expenses.   In response, Mr. Hagobian has identified each check and provided the business

4   purpose for each check.   For example, the checks made to the credit card company were for a

5   business credit card.   In addition, the Individuals provide evidence that both Mr. Hagobian and

6   members of his family were employed and did work for DDJ, Inc., both before and after the sale

7   of DDJ, Inc.'s primary assets.

8           In his reply brief, Plaintiff Joe Flores appears to concede that many of the checks were for

9   a business purpose but contends that the explanation for some remains unclear and the court

10  should not believe Mr. Hagobian's explanations because Mr. Hagobian is not credible.   Plaintiff

11  first contends that Mr. Hagobian's spread sheet "must" be based on hard drives (servers) that

12  Plaintiff asked for during discovery and Defendants stated did not exist.   Because the hard drives

13  and information contained in Mr. Hagobian's spreadsheet were not produced during discovery,

14  Plaintiff contends that the court cannot consider this evidence.   All Plaintiff has provided the

15  court with is his suspicion that the spread sheet was created based on information that should

16  have been, but was not, provided during discovery.   There is no evidence to confirm this

17  suspicion.   Despite the fact Plaintiffs were given the opportunity at the hearing to state issues

18  they wished to conduct discovery on, Plaintiffs did not request further discovery.   Thus, the court

19  does not find the spreadsheet cannot be considered because it is based on information not

20  provided during discovery.

21          Plaintiff next objects to checks written to Mr. Hagobian that Mr. Hagobian claims were

22  bi-monthly paychecks and bonuses.[5]   While Plaintiffs are correct that there is inconsistent

23  evidence concerning Mr. Hagobian's exact job responsibilities with DDJ, Inc. during the relevant

24

25          [5] To the extent Plaintiff is arguing Mr. Hagobian may not have had the authority to issue
26  the checks at issue, this fact has been considered above in concluding corporate formalities were
    not always followed because the Individuals did not always follow what would be expected in
27  the corporate form.

28                                              14

time frame, Plaintiff has no evidence that Mr. Hagobian did not do work for DDJ, Inc. and was not entitled to payment for his services.  To the contrary, Plaintiffs have maintained throughout this action that  Mr. Hagobian was exerting too much control over DDJ, Inc.   In light of the fact Mr. Hagobian clearly was working on behalf of DDJ, Inc., the court cannot find that Mr. Hagobian's statement that the checks made out to him were paychecks and bonuses is incredible.   Given Plaintiffs provide no evidence that the checks at issue did not go for the purpose explained by Mr. Hagobian, the court declines to simply disregard the Individuals' evidence. Contrary to Plaintiffs' implication, it is not the Individuals' burden to prove the checks are legitimate.  Rather it is Plaintiff's burden to prove the checks show the Individuals were treating Defendants' monetary assets as their own.

Plaintiffs object to checks written to the California Society of Certified Public Accountants and American Institute of Certified Public Accounts for Mr. Hagobian's licenses. Plaintiffs claim checks issued to an organization that keeps Mr. Hagobian licensed as a CPA were for Mr. Hagobian's personal expenses.   Without some evidence Defendants did not authorize payments to keep their employee's licenses valid, the court cannot find the payment could not have possibly been for a lawful purpose.   It is not inconceivable that a corporation or company would pay to keep a license an employee needed to conduct work for the company valid.

Plaintiffs object to payments that Mr. Hagobian states were reimbursement expenses. Plaintiff argues that because DDJ, Inc. had a credit card there would never be a need for reimbursement.   There is no  evidence on DDJ, Inc.'s policies concerning credit card use.  The court declines to conclude as a matter of law that a company would always make all purchases on a company credit card and never need to reimburse anyone for expenses.

Plaintiffs object to all payments made to Mr. Hagobian or on his behalf, such as insurance premiums, after Mr. Hagobian began his employment as the Chief Operating Officer of Yosemite Technologies, Inc. on July 30, 1999.   Absent some law or evidence to the contrary, the court

declines to find Mr. Hagobian was somehow prohibited from obtaining paychecks and benefits from two companies at the same time.

Plaintiffs object to checks paid to Darren Hagobian for expenses and charges because Darren Hagobian worked for DDJ LLC and not DDJ, Inc.   Plaintiffs' primary contention is that the Individuals have failed to prove the legitimacy of these checks, such as by providing receipts of the expenses.   The burden of proof is on Plaintiffs, not the Individuals.   The Individuals do not have to prove the legitimacy of each check.   Plaintiffs' only evidence that the checks to Darren Hagobian were not legitimate is the fact Darren Hagobian is Mr. Hagobian's son and the court should simply disbelieve anything Mr. Hagobian signs under penalty of perjury.   The court finds insufficient evidence to find Mr. Hagobian's declaration regarding the legitimacy of these checks an outright lie.

Plaintiffs object to those checks written after DDJ, Inc. was apparently sold.   The issue of DDJ, Inc.'s sale is discussed below.   In short, nothing in the payments taking place after the sale show unity of interest and control.

Finally, Plaintiffs contend that Mr. Hagobian has given inconsistent statements concerning when Defendants received $500,000.00 from T&T as part of the sale.   In his declaration, Mr. Hagobian states that Pacific Resources was paid a fee out of this cash payment. Plaintiffs provide evidence that the sale of the business assets was closed on July 30, 1999. Plaintiffs then cite to evidence that Pacific Resources did not receive any payment until January 11, 2000.   Based on this evidence, Plaintiffs argue Mr. Hagobian contradicts himself, and as such, other parts of Mr. Hagobian's declaration should be disregarded.   Plaintiffs' interpretation of Mr. Hagobian's declaration is not supported by a plain reading of the declaration.   Mr. Hagobian only states that Pacific Resources was paid a fee; He does not state this fee was paid on July 30, 1999.   While there has been no explanation given for the delay in paying Pacific Resources, it would seem this would be a matter between Defendants and Pacific Resources. Because Mr. Hagobian's declaration does not contradict itself on this issue, it does not assist in

1  finding unity of interest and control.

2       In conclusion, the court does not find that Plaintiffs' evidence regarding the checks shows

3  sufficient diversion of corporate funds for the court to find it shows unity of interest and control.

4  Given the burden of proof is on Plaintiffs, there is insufficient evidence that the Individuals were

5  unlawfully using corporate money for their personal use to such an extent that they were

6  regarding Defendants' assets as their own.

7

8  ***3.  Failure to Issue Stock***

9       Without citing any evidence, Plaintiffs next assert that Defendants failed to issue stock.

10  In general, the failure to issue stock in a corporation is grounds for piercing the corporate veil,

11  although it is not conclusive in establishing that a corporate form was the mere alter ego of an

12  individual. Marr v. Postal Union Life Ins. Co., 40 Cal.App.2d 673, 679 (1940); see also

13  Automotriz etc. de California v. Resnick, 47 Cal.2d 792, 796 (1957).

14      ***a.  DDJ, Inc.***

15       The Individuals provide evidence that DDJ, Inc. issued stock certificates to all

16  shareholders.   Thus, this factor does not support a finding of unity of interest and control as to

17  DDJ, Inc.

18       The Trustee does not dispute that stock was issued, but seems to imply that for an

19  investment of $30,000.00 in stock, the Individuals received a windfall when the company was

20  eventually sold.   The Trustee's reasoning is not a factor to support a finding of unity of interest

21  and control.   Rather, the minimum initial investment appears to only show that Defendants were,

22  for at least a time, successful.

23      ***b.  DDJ LLC***

24       Plaintiffs contend that there is no evidence DDJ LLC ever issued stock.   Limited liability

25  companies, of course, do not issue stock.   A person or entity becomes an owner or member of a

26  limited liability company when they acquire a membership interest in the limited liability

27

28                   17

1    company.   See Cal. Corp. Code § 17100 (acquisition of membership interest); Cal. Corp. Code §

2    17100 (certificate of interest may be issued to LLC's members or assignees).   A "membership

3    interest" is a "member's rights in the limited liability company, collectively, including the

4    member's economic interest, any right to vote or participate in management, and any right to

5    information concerning the business and affairs of the limited liability company".   Cal. Corp.

6    Code § 17001(z).   Thus, for the alter ego analysis, a limited liability company's failure to issue

7    membership interests, rather than its failure to issue stock, would be a factor to consider.

8         Here, the Individuals provide evidence that DDJ LLC issued membership certificates.

9    Thus, this factor does not support a finding of unity of interest and control as to DDJ, LLC.

10

11    ***4.  Failure to Adequately Capitalize***

12         Plaintiffs contend that Defendants failed to adequately capitalize.   The Ninth Circuit has

13    stated that "undercapitalization alone will justify piercing the corporate veil."   Nelson, Robbins,

14    Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1544 (9th Cir.1988).

15    However, in Nelson the president of the corporation at issue had also guaranteed the loans of the

16    corporation, and paid the corporation's bills from his own bank account, in addition to

17    undercapitalizing the corporation. Nelson, 854 F.2d at 1544.   Here it does not appear that any

18    Individual guaranteed loans or commingled funds.

19         It also does not appear Defendants were undercapitalized.   The Individuals provide

20    evidence that each Defendant had assets throughout the events at issue in this action and

21    Defendants assets exceeded their liabilities at the time of the sale of the packing business to

22    T&T.   The mere fact that Defendants operated, in part, on borrowed money is insufficient to

23    show undercapitalization.   Plaintiffs' basic argument regarding undercapitalization is that

24    Defendants must have been undercapitalized because Defendants no longer have any assets.

25    There is simply no evidence that, at the time the Defendants were formed or during the time

26    frame the conduct at issue in this action occurred, Defendants were undercapitalized.   Thus,

27

28                            18

Defendants' alleged undercapitalization does not support a finding of unity of interest and control.

### 5. Assets from Sale

Plaintiffs assert that the individuals siphoned off funds collected from the sale of Defendants' primary asset, the packing business.[6]   In their opposition, the Individuals provide evidence that following the sale of Defendants' assets to T&T, Defendants had cash and a secured for a total of $ 2,750,000.00.   T&T was to continue operating the packing business under the name Fruit Marketing of California, which resulted in Defendants change of name to DDJ, Inc and DDJ, LLC.   The sale was structured with an initial payment of $500,000 and the balance being paid in notes receivable.  As part of the sale, Mr. Hagobian and Mr. Vartan received payments of approximately $150,000 for their agreement not to compete with Fruit Marketing of California.[7]   The Individuals provide evidence that Defendants DDJ, Inc. and DDJ, LLC continued to operate as corporations and planned to invest in real estate with the payments from T&T.  Mr. Hagobian and Mr. Vartan were paid $5,000 a month to provide business, management, and financial functions to Defendants.  Defendants continued to have board meetings and file tax returns.  From 1999 until February 2001, Defendants continued to make

---

[6] Plaintiffs contends that not all of the shareholders were notified of the sale and wanted to sell the companies.   Presumably Plaintiffs are referring to Ms. Yeramian and Ms. Hagobian. Plaintiffs cite to no evidence that these shareholders did not want to sell the entitles.   To the extent they were not involved in the sale in a way that their roles would imply they should have been, this fact has been taken into account above in concluding that corporate formalities were not always followed.

[7] To the extent Plaintiffs point out there are no minutes to reflect this decision, the lack of minutes concerning the sale have been taken into account above in concluding corporate formalities were not always followed.
Further, it appears the payment was part of the sale of Defendants to T&T.  As such, T&T also agreed to the payment.  This implies the payment to not compete was part of a negotiated contract and not, as Plaintiff asserts, Mr. Hagobian merely writing checks to himself and Mr. Vartan.  Given the burden of proof is on Plaintiff, the court declines to find these payments sufficient to show unity of interest and control.

distributions to shareholders in the form of dividends.[8]   T&T eventually ceased payment to Defendants, resulting in an arbitration.   In the arbitration, T&T raised issues of misrepresentation against Defendants.   The result of the arbitration was that T&T was relieved of its obligations to continue to pay on the notes.   The Individuals contend it was the outcome of the arbitration that left Defendants without assets.

Given the evidence presented by the Individuals, the court does not find the evidence of payments to the Individuals after the sale of assets to T&T shows such siphoning off of funds as to create a unity of interest and control.   At this time, there is no evidence that the dividend payments were unlawful.   The court agrees with the assertion that $5,000 a month to Mr. Hagobian and Mr. Vartan to provide business and financial services to companies that appear to have had no purpose other than to invest payments on one note seems like high compensation. However, given the outstanding note, Defendants' liabilities did not exceed their assets.[9] Further, there is no authority for the position that a corporation's decisions, which will eventually have the result of leaving the corporation without assets does not necessitate a finding of alter ego.   These events occurred after the events at issue in this action.   The court raised the issue of additional discovery, and Plaintiffs indicated no more was necessary.   To the extent Plaintiffs believe Defendants took actions to hide their assets, the appropriate motion is not a motion to declare Individuals the Defendants' alter egos.   Regardless, these actions are insufficient to show unity of interest and control.

### 6.  Payment of Funds to Revive DDJ, Inc. During Trial

Plaintiffs contend that Mr. Hagobian payed to revive Defendant DDJ, Inc. during trial out

---

[8]  Plaintiffs have challenged these payments in another legal action.

[9]  Plaintiffs contend that the court should disregard Mr. Hagobian's explanation for the $5,000 payments because during his deposition Mr. Hagobian testified that he is providing consulting services to DDJ LLC for free.   The court finds Mr. Hagobian's deposition testimony is not inconsistent with Mr. Hagobian's declaration.   Mr. Hagobian states in his declaration that he has an independent contract relationship with DDJ, Inc. and not DDJ LLC.

of his own personal funds.   While Plaintiffs' exact argument is unclear, Plaintiffs appear to argue that this action indicates some commingling of funds as to support a finding of alter ego.

During trial it was brought to the court's attention that Defendant DDJ, Inc. was not a corporation in good standing with the California Secretary of State.   Soon after, DDJ, Inc. filed tax returns and paid $1,430.26, which revived DDJ, Inc.'s corporate status.   Plaintiffs argue that at the time of trial DDJ, Inc. had no assets.   Plaintiffs then make the assumption that Mr. Hagobian *must have* paid this amount out of his personal account.

Given the lack of evidence surrounding the payment and the fact the burden of proof is on Plaintiffs, the court cannot find the actions surrounding the payment shows unity of interest and control.   Plaintiffs provide no evidence as to where the $1,430.26 came from.   The amount was paid with a cashier's check purchased by Mr. Hagobian.   However, there is no evidence as to whose money was used to purchase the check.   Because the check was a cashiers check, it contains no reference to an account that can be traced to one of the Individuals.    While one is left to wonder were the $1,430.26 came from given the representation that DDJ, Inc. has no assets, without additional evidence, the court cannot find the payment of this check shows unity of interest and control.   Given the fact the lawyers representing Defendants, the insurance company paying for representation, some combination of the Individuals, or some third party could have paid for the check, it would be pure speculation for the court to conclude Mr. Hagobian paid for the check with his own money.    However, even if the court were to assume the Individuals paid this money on behalf of Defendant DDJ, Inc., the court does not find this one payment after DDJ, Inc. ceased to operate shows such commingling of funds that there is evidence of unity of interest and control.


### *7.  DDJ LLC Continuing to Operate*

Plaintiffs contend that DDJ LLC continued to exist after its operating agreement stated it would disband.   While it is unclear how this fact implicates the alter ego analysis, it is possible

1   Plaintiffs are attempting to use this fact to show that corporate formalities were not followed.

2           DDJ LLC's operating agreement states that the company shall dissolve upon the sale of

3   all or substantially all the assets fo the company.    Plaintiffs point out that DDJ LLC's assets

4   were sold to T&T, but DDJ LLC continued to exist for some time.    The court does not find

5   these facts contribute to a finding of alter ego liability.    While the physical assets of DDJ LLC

6   were sold and DDJ LLC ceased to exist as a packing company, DDJ LLC hardly sold

7   substantially all of its assets.    DDJ LLC continued to hold a note from T&T.    The note was a

8   substantial asset.    Thus, it does not appear the operating agreement required that DDJ LLC be

9   dissolved.

10

11  ### 8.  *Litigation With T&T*

12          In supplemental points and authorities,[10] Plaintiffs and the Trustee allege facts stemming

13  from Defendants' litigation with T&T.    Plaintiffs' and the Trustee's position is that the

14  Individuals, acting on behalf of Defendants, made a litigation decision that benefitted the

15  Individuals and deprived Defendants of a substantial asset.

16          In 1999, Defendants sold the assets of their packing business to T&T.    As part of the

17  sale, T&T became obligated on four notes  in favor of DDJ, Inc. and DDJ LLC.    When T&T

18  defaulted on the notes, on April 25, 2001, DDJ, Inc. and DDJ LLC filed a complaint in the

19  Fresno County Superior Court requesting $1,741,158.45 ("DDJ Entitles v. T&T").    On August

20  31, 2001, DDJ, Inc. and DDJ LLC attached assets belonging to T&T.    On September 6, 2002,

21

22          [10]  The Individuals contend the court should not consider the supplemental briefs because
    Plaintiffs did not have permission to file supplemental briefs.    The briefing on the motion to add
23  judgment debtors was final by the end of 2004.    Just prior to the court issuing its opinion, this
    action was stayed because of Defendants' bankruptcy.  When the court re-set the motion after the
24  stay ended, the court did not set a briefing schedule for additional briefs because no party had
    asked for the opportunity to file additional briefs.    Had any party asked to file additional briefs,
25  the court would have granted the request because almost three years have passed since the
    motion was briefed.  Because consideration of the supplemental briefs does not change the
26  outcome, the court finds that, in the interests judicial efficiency, the court will consider the
    supplemental briefs at this time instead of delaying ruling on this motion and requiring the parties
27  to seek permission to file these briefs.

28                                          22

T&T filed an action against Dennis Hagobian, Dennis Vartan, Judy Yeramian, Russell Davidson, Bill Davidson, Mike Hedberg, and W.D. Farming, LLC for misrepresentation, conspiracy to defraud, and unfair business practices.   Both matters then went to arbitration.

In the arbitrator's interlocutory opinions and tentative award, the arbitrator made several findings.   First, the arbitrator found that the agreements between T&T and DDJ, Inc. and DDJ LLC contained mandatary arbitration clauses.   Second, the arbitrator found that the fraudulent statements at issue in T&T v. Individuals were made while the Individuals were acting as agents of DDJ, Inc. and DDJ LLC.   The arbitrator's finding of agency meant that T&T's case against the Individuals was really a case against DDJ, Inc. and DDJ LLC.   By finding he had jurisdiction over the T&T v. Individuals action the arbitrator clearly found the issues in T&T v. Individuals were done while the Individuals were Defendants' agents.   Otherwise, the arbitrator would not have had jurisdiction over T&T v. Individuals because the Individuals were not party to the agreement that required binding arbitration.   By finding that the Individuals were acting as Defendants' agents, the arbitrator found the Individuals' conduct was done on behalf of Defendants and the dispute about this conduct fell within the arbitration clause.

Ultimately, the arbitrator found that DDJ, Inc. and DDJ LLC owed T&T $2,300,000.00 because the value of the packing business had been overstated.   The arbitrator also found that T&T owed DDJ, Inc. $1,048,808.97, plus interest, and T&T owed DDJ LLC $150,827.00, plus interest.   The Trustee states that the interest is valued at $265,000.00.   Thus, based on the arbitrator's award, T&T was owed $594,682.37.

As pointed out by the Individuals, the arbitrator's award was binding.   Thus, it would have been converted to a court judgement.   Instead of letting this happen, the parties agreed to settle the disputes by "walking away."   DDJ, Inc. and DDJ LLC dismissed their action against T&T, and it appears T&T dismissed its action against the Individuals.   The basis of Plaintiffs' and the Trustee's argument that this transaction shows the Individuals are the alter egos of Defendants is as follows:   DDJ, Inc. had an award in its favor of $1,048,808.97, plus interest,

and DDJ LLC had an award in its favor of $150,827.00, plus interest.   These were obviously

assets to Defendants.     The Individuals, on behalf of Defendants, "gave away" the assets  in

exchange for T&T dismissing its action against the Individuals.   Thus, concludes Plaintiffs and

the Trustee, the Individuals made a decision on behalf of DDJ, Inc. and DDJ LLC that was not in

DDJ, Inc.'s and DDJ LLC's best interest.   Instead, the Individuals obtained a personal benefit by

having T&T dismiss its claims against the Individuals.

        The problem with Plaintiffs' and the Trustee's position is that the arbitrator found that the

actions at issue in T&T v. Individuals were taken while the Individuals were acting as DDJ,

Inc.'s and DDJ LLC's agents.    The arbitrator's award was against DDJ, Inc. and DDJ LLC and

not the Individuals.   Thus, the Individuals were not found to personally owe any money to T&T

at the time the cases were settled and dismissed.    Plaintiffs and the Trustee have provided no

evidence, argument, or authority on how this court can disregard the arbitrator's findings of

agency, which established the arbitrator's jurisdiction.   In addition, Plaintiffs and the Trustee

have provided no evidence, argument, or authority why the Individuals were not acting as DDJ,

Inc.'s and DDJ LLC's agents during the events underlying T&T v. Individuals.   The burden in

this motion to amend judgment is on Plaintiffs.   Because Plaintiffs and the Trustee have

provided no law or argument on how this court can disregard the arbitrator's findings, the court

declines to find that the Individuals obtained a $2,000,000.00 benefit when DDJ, Inc. and DDJ

LLC dismissed its case against T&T.   Thus, these events do not assist a finding of unity of

interest and control.

        The also court notes that Plaintiffs contend that the Individuals have misconstrued the

amount T&T owed DDJ, Inc. and DDJ LLC.   Plaintiffs claim that T&T actually owes

Defendants money.   Plaintiffs show that if interest is calculated up until November 1, 2007, the

amount T&T owed Defendants is greater than the amount T&T owed Defendants.    The flaw in

Plaintiffs' reasoning is that it is based on the assumption that, without the settlement agreement,

T&T would not have paid Defendants and interest would have accrued up until the present day. .

24

Finding that T&T would not have paid the amount found owing by the arbitrator, allowing for interest to accrue, is pure speculation and will not be considered by the court.

### *9. Totality of Circumstances*

No one characteristic governs a finding of alter ego, and the court must look to all of the circumstances to determine whether the doctrine should be applied.   Talbot v. Fresno-Pacific Corp., 181 Cal.App.2d 425, 432 (1960).    Alter ego is an extreme remedy, sparingly used. Sonora Diamond, 83 Cal.App.4th at 538-39.   In this case, the court finds the extreme remedy of declaring the Individuals the alter egos of Defendants is not appropriate.   There is evidence showing that, at times, the Individuals disregarded the corporate form.   The evidence indicates that various Individuals took roles with Defendants that were not the same as those expected by a corporate form.   In addition, board meetings for DDJ, Inc. appear to not always have been conducted with the formality expected from a corporation.   It is also possible that the Individuals may have paid one of DDJ, Inc's debts out of their personal funds.   Finally, the court has concerns about the high fees Mr. Hagobian and Mr. Vartan were paid after the packing business was sold.   However, balancing all the factors to be considered, these implications, alone, are simply not enough to find unity of interest and control in light of the absence of any other evidence or factors pointing to a unity of interest and control.

Although disregarding the appropriate roles of officers, members, and shareholders in the corporate form is a factor considered by courts in determining whether to find alter ego liability, finding the presence of this one factor does not require a finding of alter ego liability.    Courts have cautioned against relying too heavily in isolation on the factor of concentration of ownership and control.   See Mid-Century Ins. Co. v. Gardner, 9 Cal.App.4th 1205, 1213 (1992). The failure to segregate the assets of the corporation from those of the alter ego defendant appears at the top of the list of factors considered by the courts and courts normally find several of the factors present before imposing alter ego liability.   See, e.g., Associated Vendors, Inc. v.

Oakland Meat Co., 210 Cal. App. 2d 825, 838-40 (1962).   There is simply insufficient evidence that the Individuals generally treated corporate assets as their own or disregarded the separate nature of the business.   See Mid-Century Ins. Co., 9 Cal.App.4th at 1215.   Without additional evidence, the court declines to find the fact the corporate form was disregarded in some ways is enough to find the Individuals were to alter egos of Defendants.

**B.  Inequitable Result**

The court finds insufficient evidence to meet the second requirement to establish alter ego liability.   To satisfy the second prerequisite of alter ego liability, a party must show that an inequitable result will follow if the acts are treated as those of the corporation alone.   Plaintiffs primary argument to meet the second prong of the alter ego test is that DDJ, Inc. and DDJ LLC no longer have assets.

The existence of an unsatisfied creditor does not, by itself, create an inequitable result. United States v. Standard Beauty Supply Stores, Inc., 561 F.2d 774, 777 (9th Cir. 1977).   Rather, the purpose of the alter ego doctrine is to afford such creditors protection "'where some conduct amounting to bad faith makes it inequitable . . . for the equitable owner of a corporation to hide behind its corporate veil.'" Id. (quoting Arnold v. Browne, 27 Cal.App.3d 386, 397 (1972)).   The Ninth Circuit has recognized that severe undercapitalization can satisfy the element of injustice to litigants if the capital input is insufficient to meet obligations that "could reasonably be expected to arise in the normal course" of the corporation's business. Slottow v. American Cas. Co., 10 F.3d 1355, 1360 (9th Cir.1993); Laborers Clean-Up Contract v. Uriarte Clean-Up Serv., 736 F.2d 516, 524 (9th Cir.1984).   The type of injustice or "kind of 'inequitable' result that makes alter ego liability appropriate is an abuse of the corporate form, such as undercapitalization or misrepresentation of the corporate structure to creditors." Orloff v. Allman, 819 F.2d 904, 909 (9th Cir.1987), *abrogated on other grounds*, Hollinger v. Titan Corp., 914 F.2d 1564 (9th Cir.1990).   Actual fraud is not required.   Associated Vendors, 210

Cal.App.2d at 838.    Other issues to review are: (1) Manipulation of assets and liabilities

between entities so as to concentrate the assets in one and the liabilities in the other; (2)

Diversion of assets from the corporate entity to another person or entity to the detriment of

creditors; (3) The use of the corporation as a mere shell or conduit for a single business that is

conducted by the alter ego.  Associated Vendors,, 210 Cal.App.2d at 939-840.

The fact Plaintiffs may not be able to obtain any money to satisfy their judgment against

Defendants is very unfortunate.   Yet, the evidence in the record does not approach the

inequitable result necessary for alter ego liability as to most of the Individuals.   Nothing in the

record indicates that in 1995 through 1998, Defendant had financial difficulties that extended

beyond an inability to pay off a judgment in this action.   There is no evidence DDJ, Inc. and

DDJ LLC were unable to meet their obligations because of undercapitalization.    Further, at the

time of packing business's sale, both DDJ, Inc.'s and DDJ LLC's assets exceeded their liabilities,

including the liability of the amount claimed in this action.   Unfortunately for Plaintiffs, events

that occurred after the acts at issue in this action resulted in another action that negated

Defendants largest remaining asset, the note from T&T.   Plaintiffs have provided no evidence

that DDJ, Inc. and DDJ LLC were not adequately capitalized in 1995, 1996, and 1997 when the

conduct at issue in this action occurred.   An inequitable result does not occur in those cases

where a "corporation was once adequately capitalized but subsequently fell upon bad financial

times."   Laborers Clean-Up Contract Admin. Trust Fund, 736 F.2d at 525.   The result is very

regrettable, but it does not rise to the level of being inequitable.

Had the court found unity of interest and control, the court would have looked very

carefully at the actions of Mr. Hagobian and Mr. Vartan in determining if an inequitable result

would occur if at least these two Individuals were not found to be alter egos.   There is merit to

Plaintiffs' contention that to find in favor of Plaintiffs, the jury clearly found that Mr. Hagobian

and Mr. Vartan committed fraud surrounding the sales at issue in this action.   However,

the issue is not so much whether the very purpose of the corporation was to defraud the

1    individual who is now in court complaining "as it is an issue of whether in the particular case

2    presented and for the purposes of such case justice and equity can best be accomplished and

3    fraud and unfairness defeated by a disregard of the distinct entity". Mid-Century Ins. Co. v.

4    Gardner, 9 Cal.App.4th 1205, 1212 (1992).   The jury's verdict establishes that Defendants

5    committed fraud, and the fraud was done by Defendants' employees and agents, including Mr.

6    Hagobian and Mr. Vartan.   This fraud appears to have been done to further Defendants'

7    monetary interests.   However, there is no evidence any Individual committed fraud concerning

8    the independent nature of Defendants as corporations.   Put another way, the fraud done was on

9    behalf of the Defendants and the fraud shown at trial did not concern the Defendants' corporate

10   form.   Thus, while the court is troubled by Mr. Hagobian's and Mr. Vartan's conduct, Plaintiffs

11   cannot show an inequitable result if the Individuals are not found to be Defendants' alter egos.

12

13   **C.  Control of Litigation**

14          The Individuals contend finding alter ego liability is not appropriate because there is no

15   evidence they controlled the underlying litigation in this action.   A prior judgment against a

16   corporation "'can be made individually binding on a person associated with the corporation only

17   if the individual to be charged . . . had control of the litigation and occasion to conduct it with a

18   diligence corresponding to the risk of personal liability that was involved.'" NEC Electronics

19   Inc. v. Hurt, 208 Cal.App.3d 772, 778-79 (1989) (quoting RESTATEMENT (SECOND) OF

20   JUDGMENTS § 59, at 102 (1982)); see also Minton v. Cavaney, 56 Cal.2d 576, 581 (1961).

21   The California Supreme Court has found control over the litigation where the alter ego hired

22   counsel to represent the corporation, was the person with whom the corporate defendant's

23   counsel primarily dealt, was kept fully informed of the suit's progress, was familiar with all the

24   issues, and helped draft documents for the litigation.   See Alexander v. Abbey of the Chimes,

25   104 Cal.3d 39, 46 (1980).  The California Supreme Court has found that control did not exist

26   where the alter ego only supplied funds for the prosecution or defense, appeared as a witness, or

27

28                                               28

cooperated without exerting influence over the litigation. See Minton, 56 Cal.2d at 581.

The Individuals provide evidence that the litigation was paid through Defendants' insurance.   The Individuals provide evidence that, while they assisted counsel, appeared as witnesses, and discussed the case with counsel, they did not control the litigation.   Plaintiff cites to no evidence showing the Individuals, as opposed to the insurance company, ultimately controlled the underlying litigation.   Thus, even if the court were to find some unity of interest and control, amending the judgment to name the Individuals the alter egos of Defendants would not be appropriate.

### ORDER

Accordingly, for the reasons stated in this memorandum opinion, Plaintiffs' motion to amend the judgment to add the Individuals as Defendants' alter egos is DENIED.   All pending motions concerning this post-judgment issue are DENIED as moot.


IT IS SO ORDERED.

**Dated:   November 28, 2007**                          **/s/ Anthony W. Ishii**
                                                        UNITED STATES DISTRICT JUDGE

29